## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QUAYURI COLEMAN, | : | CIVIL ACTION NO. 1:20-CV-1163 |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| v. | : | |
| | : | |
| RED LION CONTROLS, INC., | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff Quayuri Coleman brings claims of employment discrimination against defendant Red Lion Controls, Inc. ("Red Lion"), pursuant to 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. § 951 *et seq.* Red Lion moves for summary judgment on all claims. We will grant in part and deny in part the motion.

## I.    Factual Background & Procedural History[1]

Red Lion is headquartered in York and offers "industrial automation and networking products" to its customers. (See Doc. 19 ¶ 5). Coleman, who is Black,

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 23, 26). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

began working for Red Lion in 2014.  (<u>See</u> Doc. 19 ¶ 4; Doc. 23 ¶ 1).  In July 2014, Coleman's 90-day period of temporary employment ended and he became a regular employee, with the job title of general assembler.  (<u>See</u> Doc. 23 ¶ 2).  This position required work on Red Lion's production floor assembling electronic parts, and paid Coleman $10.20 per hour.  (<u>See</u> <u>id.</u> ¶¶ 2-3).

Jody Brenner acted as Coleman's direct supervisor during his first nine months.  (<u>See</u> <u>id.</u> ¶ 11).  According to Coleman, Brenner mistreated him regularly. For example, Coleman communicated his desire for overtime, but Brenner routinely ignored Coleman and asked his Caucasian coworkers whether they wanted overtime.  (<u>See</u> Doc. 26 ¶ 25).  Coleman stated that Brenner "would move down the line towards the end of the day and ask everybody who wanted overtime. She would get to Tiffany Winters [a Caucasian] beside me and ask her . . . and then she would walk past me and ask the next person."  (<u>See</u> Coleman Dep. 40:1-23, 41:4-5).[2]  Brenner also excessively monitored Coleman whenever he performed his job or even used the restroom—Coleman described this behavior as Brenner "hawking" him.  (<u>See</u> <u>id.</u> at 41:6-42:13).  Coleman stated that Brenner's treatment of him was apparent to Winters, who once commented: "I don't really think she – she [Brenner] cares for Black guys."  (<u>See</u> <u>id.</u> at 42:13-43:6).

---

[2] Deposition transcripts or portions thereof have been filed by the parties at separate docket entries.  (<u>See</u> Docs. 26-2, 24-1).  We cite to the deposition transcripts only, using the convention "[Name] Dep.," without repeating the various docket entry citations.

In March 2015, Red Lion transferred Coleman from general assembler to repair technician.  (<u>See</u> Doc. 23 ¶ 5).  Coleman stated he received a transfer because he complained about Brenner's mistreatment.  (<u>See</u> Coleman Dep. 36:16-37:24).  He testified that when he complained to the current plant supervisor Gerry Keith[3] about Brenner, Keith promptly convened a meeting with Coleman, Brenner, and production manager Lori Adams.  (<u>See id.</u> at 51:5-13, 51:25-52:10; Doc. 24-5).  During the meeting, Coleman stated he felt Brenner was treating him differently because of his race, and Keith encouraged Coleman to ask Brenner directly.  (<u>See</u> Coleman Dep. 51:8-14).  According to Coleman, Brenner refused to answer his question, stating "I choose not to comment."  (<u>See id.</u> at 51:13-16).  Keith repeated the question, and Brenner reiterated "I have nothing to say."  (<u>See id.</u> at 51:16-24).  In its defense, Red Lion points to a contemporaneous email from Adams stating that Coleman was transferred "due to his experience in repairs."  (<u>See</u> Doc. 23 ¶ 32; Doc. 24-5).  Coleman received a pay rate increase to $11.00 per hour within 60 days of the transfer.  (<u>See</u> Doc. 23 ¶ 6).

Coleman's early history as a repair technician is also disputed.  According to Coleman, he soon learned that no other technician was being paid $11.00 per hour.  (<u>See</u> Coleman Dep. 62:25-63:23).  Other technicians reportedly encouraged him to complain because his pay rate was more closely aligned with general assembly work (his initial work assignment) rather than his current repair technician duties.  (<u>See</u>

---

[3] The record contains two spellings of Keith's first name, either "Jerry" or "Gerry."  We adopt the spelling utilized in Red Lion's human resources communications.  (<u>See</u> Doc. 26-9).

id. at 57:7-23; 63:3-16).  Coleman complained to Adams and his then-supervisor Adam Wilt about pay disparity, asking why he had to "prove" himself, when his Caucasian coworkers "just got that position."  (See Doc. 26 ¶ 37).  The parties agree Coleman received a pay increase in January 2016 to $16.82 per hour.  (See id. ¶ 36).  Coleman stated it occurred because of his complaints about pay disparity, (see Coleman Dep. 58:16-25, 61:2-62:14), while Red Lion business records label this increase a "cost of living adjustment," (see Doc. 23 ¶ 36; Doc. 24-2 at 2).

Coleman continued to work at Red Lion without serious incident for several years.  Coleman's 2018 annual review concluded his work "meets expectations," with an overall score of 3.00 on a 5-point scale in seven competencies: productivity level, quality of work, motivation, interpersonal skills, attendance, adaptability, and continuous improvement.  (See Doc. 24-7).  Coleman's September 2019 midyear review was not scored, but comments noted he did a "great job" addressing his own repair work and "continues to improve his troubleshooting skills."  (See Doc. 26-12 at 2).  His 2019 annual review fell in the same range of "meets expectations," with a slightly higher overall score of 3.29.  (See Doc. 24-9).  Coleman reportedly did not receive a copy of this review.  (See Doc. 26 ¶ 21).

Coleman stated he believed his 2018 performance review was discriminatory because some of his Caucasian coworkers received higher scores than him, but could not recall any of these higher-scoring coworkers with particularity.  (See Coleman Dep. 173:4-21).  Coleman also considered the 2019 review discriminatory based on his rating, stating "I could do an excellent job and it still wouldn't be good enough compared to other people."  (See id. at 179:21-180:11).  He recalled his

Caucasian coworker "Penni" garnered a higher rating than him in the "troubleshooting" competency, even though Coleman "had good troubleshooting skills." (See id. at 58:3-4, 180:15-25, 182:8-183:23).

In 2019, Coleman complained to management several times about what he perceived as unfair treatment. For example, human resources manager Korri Colon emailed John Claus, vice president of human resources, in July with the subject "Discrimination Claim." (See Doc. 26-9). Colon stated Coleman "frequently tells people he is treated different because of his race" and relayed that Coleman regarded another employee named Laura as racist because she "gave him a look" when they were in the same area of the building. (See id. at 1). Colon noted "this seems to be a common practice for [Coleman]" and outlined a plan to review Red Lion's handbook with him. (See id.) Colon further wrote: "Also, this is before our time . . . but apparently we had a PTH supervisor that admitted to having a prejudice against [Coleman] in front of [Coleman] and Gerry." (See id.) According Red Lion, Brenner was Coleman's supervisor when he worked in the "PTH" department. (See Doc. 24-3). Colon concluded her email by stating "I don't get the impression that there is any true discrimination activity, but I imagine we want to handle this somewhat delicately if there was a point and time where a Red Lion leader admitted to treating [Coleman] differently." (See Doc. 26-9).

Claus replied to Colon's July email, agreeing that Colon should review the handbook policy with Coleman and noting "we also need to make it clear that we expect any allegations to be in good faith." (See Doc. 26-9 at 1). He further stated Coleman "needs to be careful about throwing around 'racist' simply because of the

way someone looks at him." (See id.)  Coleman confirmed Colon spoke with him in July and admonished him to "watch the type of complaints you make" or "watch what you say." (See Coleman Dep. 199:8-200:25, 216:4-217:6).

On December 4, 2019, Coleman's then-supervisor, Alan Hewitt, gave a presentation during a meeting that took place occurred near Coleman's workspace. (See Doc. 23 ¶¶ 15, 42; Doc. 24-9 at 2).  During this presentation, Hewitt stated: "The team is in there slaving away.  I am trying not to whip them too hard because it is the holidays." (See Doc. 24-9 at 2).  Plant manager Jason Griffith, who was in attendance, sent an email to Colon and Claus regarding the incident, stating it was not acceptable and made people uncomfortable. (See id.)  Griffith also wrote: "As we know the topic of race has come up with [Coleman] at different times with different leaders . . . during my last two 1:1's with [Hewitt] he has mentioned allegations from [Coleman] regarding his perception of inconsistent treatment due to race." (See id.)  Griffith recommended that Hewitt be terminated. (See Doc. 26 ¶ 45).  Coleman did not personally attend the meeting, but recalled overhearing Hewitt make the comment, and that Hewitt apologized to him later that day. (See id. ¶ 44; Coleman Dep. 100:1-101:23).

Coleman also complained about Griffith's treatment of him sometime in December 2019. (See Doc. 23 ¶ 46).  Griffith removed a stress ball and some other personal belongings from Coleman's desk while conducting a safety audit. (See id. ¶¶ 46-47).  According to Coleman, standard procedure for safety audits included an email to any employee with hazardous items on their desk, so the employee could remove the items personally. (See Coleman Dep. 117:21-118:2, 118:18-119:9).

Griffith, however, cleared Coleman's desk without notifying him the items were a hazard. (See id. at 119:6-16). Coleman considered it discriminatory because he recalled Caucasian coworkers who had been notified of plants or other items on their desks and they had been given the opportunity to take them home. (See id. at 124:1-18). Coleman also attested that around this time, he began to feel "like [he] was a target for speaking up." (See id. at 125:1-21, 126:9-127:6).

Coleman complained to Colon again in either late December 2019 or early January 2020 regarding a Caucasian coworker named Jesse Bensill. (See Coleman Dep. 128:18-23). Per Coleman, Bensill was hired in the repair department after him and they had the same level of education. (See id. at 128:23-129:4, 131:13-24). Bensill soon received a transfer to a "tech engineer" position, along with a pay raise and his own office. (See id. at 130:1-25). Coleman had previously inquired into applying for this position and was told by his then-supervisor Dirk Young that he did not have the requisite degree. (See id. at 130:1-131:12). Coleman did not apply for the promotion Bensill received. (See id. at 131:5-7).

Red Lion terminated Coleman's employment on January 30, 2020. (See Doc. 23 ¶ 16). Red Lion states Coleman's job loss was part of a reduction in force ("RIF") due to "poor economic conditions." (See id. ¶ 17). A RIF analysis from Red Lion rates Coleman and nine other employees on a 5-point scale in five categories: decision quality, internal customer service, communication skills, results driven, and collaboration, and noted the presence or absence of a critical skill. (See Doc. 24-4). The RIF categories overlap with, but do not mirror, the annual review

competencies.  (<u>Compare</u> Docs. 26-11 to -13 <u>with</u> Doc. 24-4).[4]  The RIF analysis also provides information on the employee's years of service, previous performance rating, record of discipline, and contains a comment section.  (<u>See</u> Doc. 24-4). Finally, it contains demographic information such as race, gender, and age.  (<u>See</u> <u>id.</u>)  The RIF analysis is not authored, and the record does not indicate who at Red Lion participated in creating the RIF analysis or in the decision-making about how employees were scored or selected for termination.

According to the RIF analysis, Coleman and five other employees received the lowest possible score of 1 point in all five RIF categories, receiving a total score of 5 out of 25.  (<u>See</u> <u>id.</u>)  Coleman also received a "No" for presence of a critical skill, he was not listed as having any particular "expertise/special strengths/skills," and his comments section stated: "Only has knowledge of repair for Graphite (not cross-trained)."  (<u>See</u> <u>id.</u>)  The RIF analysis mentions cross-training in relation to seven of the ten employees listed.  (<u>See</u> <u>id.</u>)

The parties agree that Coleman and five other employees within Red Lion's repair department were terminated in January 2020.  (<u>See</u> Doc. 23 ¶ 20).  Four of the employees selected for termination were Caucasian, and one employee was Asian. (<u>See</u> <u>id.</u>)  Three of the retained employees were Caucasian, and one was Black.  (<u>See</u> Doc. 24-4).  Coleman disputes the RIF analysis, proffering testimony from former

[4] Annual review competencies included "productivity level," "motivation/initiative," and "interpersonal skills."  (<u>See</u> Doc. 26-11).  These would appear to overlap with RIF categories "decision quality," "results driven," and "communication skills."  (<u>See</u> Doc. 24-4).

plant manager Kyle Shearer that Coleman *was* cross-training while he worked at Red Lion.  (See Doc. 26-6, Shearer Dep. 34:1-14).  At the time of his separation, Coleman refused Red Lion's severance payment offer.  (See Doc. 23 ¶ 18; Doc. 26 ¶ 18; Coleman Dep. 158:1-11).

Coleman filed the instant lawsuit in July 2020, and an amended complaint in April 2021, alleging race discrimination, hostile work environment, and retaliation under state and federal law.  Red Lion now moves for summary judgment on all six of Coleman's claims.  The motion is fully briefed and ripe for disposition.

## II.   Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non[]moving party and draw all reasonable inferences in that party's favor."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

### III.   Discussion

Coleman brings the following claims: hostile work environment pursuant to Title VII and the PHRA; and race discrimination and retaliation pursuant to Title VII, Section 1981, and the PHRA.  We address these claims *seriatim*.

### A.   Hostile Work Environment

Title VII makes it unlawful for an employer to, *inter alia*, "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  This prohibition includes harassment "that is sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment."  See Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); see also Komis v. Sec'y of United States Dep't of Lab., 918 F.3d 289, 293 (3d Cir. 2019) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (Title VII violated when workplace "is permeated with discriminatory intimidation, ridicule, and insult")).[5]  To prevail on a hostile work environment claim, a plaintiff must establish "(1) he suffered intentional discrimination due to his [race], (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected

---

[5] The PHRA also forbids an employer from racial discrimination "with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract."  See 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).  Our court of appeals interprets the PHRA as "identical to federal antidiscrimination laws except where there is something specifically different in its language requiring that it be treated differently."  Jones v. SEPTA, 796 F.3d 323, 327 (3d Cir. 2015) (citation and quotation marks omitted).

[him], (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability."  See Mandel, 706 F.3d at 167 (citation omitted).

Conduct must "alter the conditions of [the plaintiff's] employment and create an abusive working environment" to be deemed "severe or pervasive."  See Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 214 (3d Cir. 2017) (quoting Meritor, 477 U.S. at 67).  The court inquires into whether conduct in the work environment meets this standard by considering "the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  See Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Isolated incidents can create a hostile work environment only if they are "extremely serious."  See id. at 264 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Two incidents that bookend Coleman's employment qualify as intentional discrimination: Brenner's mistreatment of Coleman soon after he began at Red Lion in 2014, and Hewitt's December 2019 "slave" comment that Coleman overheard.  These acts, while undoubtedly both unprofessional and offensive, do not rise to the level of severity or pervasiveness required to alter Coleman's working environment.  Cf. Moody, 870 F.3d at 214.  The incidents occurred five years apart, originated from two different individuals, and both resulted in corrective action by

11

Red Lion, *viz.*—a transfer to another department in 2015, and an apology from Hewitt in 2019.

Coleman's focus on other events of record is unpersuasive. There is no objective indication beyond Coleman's *ipse dixit* that his "meets expectations" annual reviews in 2018 and 2019 were in some way discriminatory. Although Coleman stated during his deposition that a Caucasian coworker received a higher score than he did in "troubleshooting," (see Coleman Dep. 179:1-180:25), Coleman's mere disagreement with his evaluations does not imply that the evaluator's rating was discriminatory. So too for Bensill's 2019 transfer to a position in which Coleman had expressed interest, as Coleman conceded he had not applied for the transfer. (See Coleman Dep. 130:16-131:7). The safety audit incident with Griffith could be considered an isolated incident of mistreatment, but it does not approach the requisite seriousness needed to create a hostile work environment. Cf. Castleberry, 863 F.3d at 265. And even assuming *arguendo* all three events were tinged with racial animus, the incidents were infrequent and nonthreatening, and Coleman reported no unreasonable interference with his work performance. Cf. id. at 264.

Coleman has not met his burden to establish a claim for hostile work environment under Title VII or the PHRA because the mistreatment he experienced was not "severe or pervasive" enough "to alter the conditions of" his employment. See Moody, 870 F.3d at 214. We will grant Red Lion's motion for summary judgment on these claims.

## B.    Race Discrimination

Title VII prohibits an employer from discharging "any individual . . . because of such individual's race."  See 42 U.S.C. § 2000e-2(a)(1).  The PHRA similarly makes it unlawful for an employer to discharge an individual due to his race.  See 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).[6]  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  See 42 U.S.C. § 1981(a).[7]

Under the McDonnell Douglas burden-shifting standard, a Title VII plaintiff establishes a *prima facie* case of discrimination by presenting sufficient evidence that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination.  See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  In RIF cases, however, the fourth prong shifts to whether "persons outside of the protected class were retained."  See *In re* Carnegie Ctr. Assocs., 129 F.3d 290, 295 (3d Cir. 1997); see also Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006).  Individuals "outside the protected class" must be "similarly situated" to the

---

[6] The court reviews PHRA claims under the same standards as Title VII claims.  See Connelly v. Lane Constr. Corp., 809 F.3d 780, 791 n.8 (3d Cir. 2016) (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000)).

[7] The court reviews Section 1981 racial discrimination claims under the same standards as Title VII claims.  See Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 256 (3d Cir. 2017) (quoting Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009)).

plaintiff—they must "work in the same area in approximately the same position." See Lepore v. Lanvision Sys., Inc., 113 F. App'x 449, 452 (3d Cir. 2004) (nonprecedential) (quoting Anderson v. Consol. Rail Corp., 297 F.3d 242, 250 (3d Cir. 2002)).

 If the plaintiff proves a *prima facie* case, the burden of production shifts to the employer to identify a "legitimate, nondiscriminatory reason" for its conduct. See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting McDonnell Douglas, 411 U.S. at 802). The defendant's burden at this stage is "'relatively light,'" and is a burden of production only. See Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Tomasso, 445 F.3d at 706). Assuming the employer meets its burden, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's stated reason is pretextual. See Fuentes, 32 F.3d at 763.

To demonstrate pretext and defeat summary judgment, a plaintiff must identify evidence that would allow the factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." See Shaner v. Synthes, 204 F.3d 494, 501 (3d Cir. 2000) (quoting Fuentes, 32 F.3d at 764). The plaintiff may call attention to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (quoting Fuentes, 32 F.3d at 764). The plaintiff can also point to evidence that the employer previously discriminated against him; discriminated against others in the plaintiff's protected class; or treated others who were similarly

situated, but not in plaintiff's protected class, more favorably than it treated the plaintiff.  See id. at 645 (citing Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998)).  However, a plaintiff endeavoring to demonstrate pretext cannot "simply show that the employer's decision was wrong or mistaken." See Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (quoting Fuentes, 32 F.3d at 765).  The plaintiff must offer "evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision." Tomasso, 445 F.3d at 706 (quoting Kautz, 412 F.3d at 467).

In the matter *sub judice*, Coleman has proven a *prima facie* claim of discrimination under the modified McDonnell Douglas standard for RIF cases.[8] The parties agree that Coleman was terminated in January 2020, along with four Caucasian employees and one Asian employee.  (See Doc. 23 ¶ 20; Doc. 26 ¶ 20).  The RIF analysis also includes four employees who were not selected for termination: three Caucasian employees and one Black employee.  (See Doc. 24-4).  All employees listed on the analysis worked in Red Lion's repair department, and the two retained employees who shared Coleman's exact job title were both Caucasian. (See id.; see also Doc. 23 ¶ 20).  These two retained employees are therefore "similarly situated" to Coleman.  See Lepore, 113 F. App'x at 452.  Coleman has met

---

[8] Red Lion contests Coleman's race discrimination claims at the *prima facie* stage, arguing Coleman cannot demonstrate that "nonmembers of the protected class were treated more favorably" because four Caucasian employees and one Asian employee were also terminated.  (See Doc. 22 at 4-7).  Due to the modified *prima facie* test, Red Lion's focus on the individuals who were terminated, rather than retained, is misplaced.

his *prima facie* burden to show that employees outside of his protected class were retained during Red Lion's January 2020 RIF.  See <u>In re</u> <u>Carnegie</u>, 129 F.3d at 295.

Red Lion also meets its "relatively light" burden of production by putting forth the "legitimate, nondiscriminatory reason" for Coleman's termination—an economically necessary reduction of its labor force.  See <u>Fuentes</u>, 32 F.3d at 763; <u>Burton</u>, 707 F.3d at 426.  The burden therefore shifts back to Coleman to establish pretext.  See <u>Fuentes</u>, 32 F.3d at 763.  Coleman briefs on three factual issues that have merit: Brenner's mistreatment in 2014; Coleman's cross-training, or lack thereof, at the time of his termination; and the sudden drop between his annual review scores and his RIF scores.

Coleman can first show evidence of pretext because the present record indicates Red Lion, through Brenner, discriminated against Coleman early in his employment.  In addition to Coleman's deposition testimony about Brenner's mistreatment, Colon's July 2019 email states "we apparently had a PTH supervisor that admitted to having a prejudice against [Coleman] in front of [Coleman] and Gerry."  (<u>See</u> Doc. 26-9).  This acknowledgement of Brenner's disparate treatment, together with factual allegations of disparate treatment by Hewitt and Griffith, sufficiently raises the specter of pretext approved in <u>Willis</u> as "evidence that the employer previously discriminated against" Coleman.  See <u>Willis</u>, 808 F.3d at 345.

Second, Coleman has demonstrated a material factual dispute regarding the reason stated for his termination in the RIF analysis comment section.  According to Red Lion's RIF analysis, Coleman was "not cross-trained" because he "[o]nly ha[d] knowledge of repair for Graphite."  (<u>See</u> Doc. 24-4).  Although neither party

defines "cross-trained," Coleman proffers testimony from Shearer, who stated "working as a floor technician and then as a repair technician" could qualify as cross-training because it would allow the employee to experience a "different breadth and scope of work by having different exposure." (See Shearer Dep. 34:1-11). Shearer affirmed Coleman "was cross-training" during his employment. (See id. at 34:12-14). This constitutes "evidence contradicting the core facts" for the reason Coleman was chosen for termination during the January 2020 RIF. See Tomasso, 445 F.3d at 706. Cross-training was particularly relevant to Red Lion's termination decisions—Red Lion included this phrase for seven of the ten employees it considered in its RIF analysis. (See Doc. 24-4).

Finally, Coleman questions the accuracy and legitimacy of the scores provided in the RIF analysis. We are mindful that courts "do not sit as a super-personnel department that reexamines an entity's business decisions," see Capps v. Mondelez Glob., LLC, 847 F.3d 144, 154 n.9 (3d Cir. 2017) (citation omitted), and that during a RIF, "even qualified employees are laid off," see Tomasso, 445 F.3d at 707. But we also recognize "low evaluation scores may be a pretext for discrimination, especially where, as here, an employer uses subjective criteria . . . to rate its employees." See id. at 706 (citing Goosby, 228 F.3d at 320 (identifying "drive," "special knowledge," and "initiative" as examples of subjective criteria)). And Coleman does not merely take issue with his own low RIF scores, but the fact that each discharged employee, no matter their years of service or special skills, inexplicably received a RIF score of 1 in every subjective category. (See Doc. 24-4). In contrast, Coleman's 2019 annual review gave him a 5 in "productivity level" and

a 3 in every other core competency.  These competencies contain at least some

measure of overlap with the listed RIF categories.  (<u>See</u> Docs. 26-13, 24-4).

Comparing Coleman's 2019 annual review to his RIF score, and considering the

uniformity of each discharged employee's score, a rational factfinder could

conclude the use of these scores to discharge Coleman and five others was

"implausible."  <u>See</u> <u>Willis</u>, 808 F.3d at 644.

For all of these reasons, Coleman has proffered sufficient evidence to show

that Red Lion's decision to terminate him could have been pretextual.  <u>See</u> <u>Fuentes</u>,

32 F.3d at 763.  Summary judgment on Coleman's discrimination claims is not

warranted, and we will deny this portion of Red Lion's motion.

## C.      Retaliation

Title VII prohibits an employer from discriminating against an employee

because he, *inter alia*, "has opposed any practice made an unlawful employment

practice by this subchapter."  <u>See</u> 42 U.S.C. § 2000e-3(a).[9]  To establish a *prima facie*

case of retaliation under Title VII, a plaintiff must show that (1) he engaged in a

protected activity, (2) he suffered an adverse employment action, and (3) there was

a causal connection between the protected activity and the adverse employment

---

[9] The PHRA likewise forbids discrimination "against any individual because
such individual has opposed any practice forbidden by this act."  43 PA. STAT. AND
CONS. STAT. ANN. § 955(d).  Section 1981 also encompasses retaliation claims.  <u>See</u>
<u>CBOCS West, Inc. v. Humphries</u>, 553 U.S. 442, 457 (2008).  Our court of appeals
generally applies the same analytical framework to PHRA and Section 1981
retaliation claims as to Title VII retaliation claims.  <u>See</u> <u>Connelly</u>, 809 F.3d at 791 n.9
(citing <u>Krouse v. Am. Sterilizer</u>, 126 F.3d 494, 500 (3d Cir. 1997) (PHRA));
<u>Castleberry</u>, 863 F.3d at 267 (Section 1981).

action.  See Carvalho-Grevious, 851 F.3d at 257 (citing Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006)).

For purposes of the instant motion, Red Lion challenges only the causation element of Coleman's *prima facie* case.  For retaliation claims, the timing between an employee's protected activity and the adverse employment action may be indicative of causation if it is "unusually suggestive of retaliatory motive."  See Shaner, 204 F.3d at 505 (citing Krouse, 126 F.3d at 503).  A "bright line rule" for unusually suggestive timing does not exist, but "temporal proximity" alone is rarely sufficient to establish causation.  Compare Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997) (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (two-day lapse sufficient to infer causation)) with Moody, 870 F.3d at 221 (citing LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) (inference from temporal proximity "begins to dissipate" with lapse of three or more months)); see also Shinn v. FedEx Freight, Inc., 783 F. App'x 229, 233 (3d Cir. 2019) (nonprecedential) (citing Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (two-month lapse, by itself, insufficient)).  The court is not limited to considering temporal proximity, however, and a plaintiff may establish causation by pointing to "any other evidence in the record sufficient to support the inference of retaliatory animus."  See LeBoon, 503 F.3d at 232-33 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000)).

Title VII retaliation claims also follow the McDonnell Douglas burden-shifting framework.  See Carvalho-Grevious, 851 F.3d at 257 (citing Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 198 (3d Cir. 2015)).  If the employee succeeds in proving

his *prima facie* case, the burden shifts to the employer to produce a legitimate, nonretaliatory reason.  See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003).  After the employer articulates such a reason, the plaintiff bears the burden of demonstrating that the given explanation is mere pretext and "unworthy of credence."  See Carvalho-Grevious, 851 F.3d at 262 (quoting Daniels, 776 F.3d at 199).

Red Lion contends Coleman cannot establish the causation element of his *prima facie* case, nor can he rebut the nonretaliatory reason for his termination.  We disagree.  The parties do not dispute that Coleman's employment ended on January 30, 2020.  (See Doc. 23 ¶ 16).  In December of 2019, at least two incidents occurred: Hewitt's slave comment and Griffith's safety audit.  (See Doc. 23 ¶¶ 41, 46; Doc. 24-6).  The record does not indicate Coleman complained about Hewitt's comment to anyone, as he noted Hewitt apologized to him on the same day.  (See Doc. 26 ¶ 44; Coleman Dep. 100:1-101:23).  But he did complain about Griffith's safety audit.  (See Doc. 23 ¶¶ 46-47; Coleman Dep. 125:1-21).  Coleman also contends he complained to Colon in "late December" or "early January 2020" regarding Bensill's promotion. (See Doc. 23 ¶¶ 58-59; Doc. 26 ¶¶ 58-59).  Thus, Coleman's complaints of racial mistreatment were on an upswing in the month before his termination.

Internal emails between Colon, Claus, and Griffith indicate upper management at Red Lion was well aware of Coleman's tendency to complain about discrimination.  In July 2019, Colon noted in an email to Claus that Coleman "frequently tells people he is treated differently because of his race" and that "this seems to be a common practice for" Coleman.  (See Doc. 26-9 at 1).  Acknowledging

she was aware of Brenner's admitted mistreatment of Coleman in 2014, Colon concluded no "true discrimination activity" had occurred in the July 2019 incident—involving claims of racism based upon an employee's allegedly disparaging look at Coleman. (See id.)  Thereafter, Claus directed Colon to inform Coleman "to be careful about" his accusations of racism at work. (See id.)  Both emails could be read to indicate that, despite Claus and Colon's knowledge of Brenner's maltreatment of Coleman, they disbelieved Coleman's complaints before ever investigating them.  Thus, construing the record in a light most favorable to Coleman, the month that lapsed between his final complaint and his termination, coupled with management's rush to judgment on the merits of his complaints, provide an inference of causation.  See Woodson, 109 F.3d at 920; Shinn, 783 F. App'x at 233.

Having concluded Coleman can establish a *prima facie* case of retaliation, we incorporate our earlier analysis as to steps two and three of the McDonnell Douglas framework.  Red Lion has met its burden of production by pointing to a necessary RIF as its legitimate, nondiscriminatory reason for Coleman's termination. (See Doc. 23 ¶ 17); Shellenberger, 318 F.3d at 189.  And just as a factfinder could conclude that Red Lion's proffered reasons for terminating Coleman were a pretext for racial discrimination, so too could the factfinder conclude the RIF analysis is "unworthy of credence," and that Coleman was terminated for his complaints of

21

racial discrimination and harassment. [10]  See Carvalho-Grevious, 851 F.3d at 262.

Summary judgment is not warranted on these claims.

IV.    **Conclusion**

We will grant in part and deny in part Red Lion's motion (Doc. 21) for

summary judgment.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    March 24, 2022

---

[10] Coleman also questions the actions of Colon and Griffith because he alleges they provided Coleman's low RIF scores and were directly involved in his 2019 complaints.  (See Doc. 27 at 18-20).  Yet Coleman has not proffered, nor does he point to, any evidence in the present record establishing any Red Lion employee's involvement in the RIF analysis.  The Colon deposition excerpt speaks only to Red Lion's discrimination policy and Colon's approach to an employee's report of discrimination.  (See Doc. 26-3, Colon Dep. 16:3-17:25).  Griffith's deposition excerpt relates to his knowledge of Coleman's complaints, their escalation to Jennifer Prisco, and his understanding of the proper method of registering complaints.  (See Doc. 26-5, Griffith Dep. 96:3-97:25).  Neither excerpt discusses the RIF analysis or scoring.